Filed 4/27/23  In re P.S. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

|  |  |
|---|---|
| In re P.S. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | D081222 |
| Plaintiff and Respondent, | (Super. Ct. No. NJ15699A-E) |
| v. | |
| L.S. et al., | |
| Defendants and Appellants. | |

APPEAL from orders of the Superior Court of San Diego County, Michael Imhoff, Commissioner.  Affirmed.

Paul A. Swiller, under appointment by the Court of Appeal, for Defendant and Appellant, L.S.

Jack A. Love, under appointment by the Court of Appeal, for Defendant and Appellant, J.S.

Claudia G. Silva, County Counsel, Lisa M. Maldonado, Chief Deputy County Counsel, and Kristen M. Ojeil, Deputy County Counsel, for Plaintiff and Respondent.

## INTRODUCTION

L.S. (Mother) and J.S. (Father) appeal orders terminating their parental rights to three of their five children: P.S., Ka.S., and Ke.S. Joining in each other's arguments, the parents contend the juvenile court erred by not applying the sibling relationship exception set forth in Welfare and Institutions Code[1] section 366.26, subdivision (c)(1)(B)(v). They maintain that the court should have selected legal guardianship for the children's permanency plan instead of adoption. We conclude the juvenile court did not err and affirm the orders.

## FACTUAL AND PROCEDURAL BACKGROUND[2]

### I.

### *Initial Proceedings*

This family first came to the attention of the San Diego County Health and Human Services Agency (Agency) in 2016 and has been the subject of 18 past referrals for lack of supervision. P.S. is now 14 years old, twins Ka.S. and F.S. are 12 years old, Ke.S. is eight, and E.S. is seven. All of the children except Ke.S. have been diagnosed with autism spectrum disorder (ASD) and F.S. and E.S. are nonverbal.

---

[1]   All further undesignated statutory references are to the Welfare and Institutions Code.

[2]   The facts summarized herein will be limited to those necessary for context and to address applicability of the sibling relationship exception to adoption.

For approximately a year prior to the Agency's removal of the children, the family resided with the paternal grandparents. The parents frequently left the children with the paternal grandparents for days at a time without warning and did not keep in contact. Despite their good intentions, the paternal grandparents struggled to supervise the children on their own. Although the Agency offered services, the parents avoided meeting with Child Welfare Services and were otherwise uncooperative, and the paternal grandparents declined to take advantage of any of the services offered.

A.      *Initiation of Dependency Proceedings through Disposition*

In December 2020, the Agency took the children into protective custody, placed them at Polinsky Children's Center (Polinsky), and filed petitions under section 300, subdivision (b)(1) on their behalf based on a substantial risk of serious physical harm. The petitions alleged the parents failed to supervise the children and left them with the parental grandparents, who also inadequately supervised them and failed to follow through with additional resources provided by the Agency to assist in meeting the children's needs. In particular, the petitions cited an incident in October when E.S., who was four years old at the time, left the family's beachfront hotel room unnoticed and ran into the ocean. He was found struggling in the water by a kayaker, who notified police. The Agency also noted ongoing concerns regarding the children wandering the neighborhood naked or half-clothed and getting onto the roof of the paternal grandparents' home while in the grandparents' care.

At the continued detention hearing, both parents denied the allegations in the petitions. The court found prima facie evidence of the allegations, ordered the children detained, and authorized liberal supervised visitation for the parents.

3

The Agency filed an addendum report prior to the jurisdiction and disposition hearing wherein it indicated that the parents had not been in contact with the Agency or visited the children. P.S. told a social worker she did not expect her parents to visit because they had not returned her call, and "they only do what they want, my grandparents take care of us and they just come and go without telling us anything." She said they had been coming and going for up to 10 days at a time for a long time and that she did everything for her brothers and sisters. The paternal grandparents did, however, visit the children three to five times per week at Polinsky.

The Agency concluded in its initial assessment that the parents' behavior resulted in the children having "vast dental needs," failing grades, poor school attendance, and lapses in supportive developmental and educational services. Additionally, "[a]ll five of the minors present[ed] with some level of special need or developmental delay that require[d] immediate attention."

In February 2021, the Agency placed P.S., Ka.S., and Ke.S. in a foster home. The caregivers facilitated visits with the paternal grandparents and the remaining siblings at Polinsky. The parents met once with a social worker, but never completed the interview or paperwork, and did not attend scheduled visitations with the children.

After several continuances because neither their attorneys nor the Agency could reach the parents or engage them in the process, the juvenile court held a contested jurisdiction and disposition hearing in March 2021 and sustained the petitions. The court declared the children dependents, removed custody from the parents, and adopted the Agency's recommendations regarding services.

4

B.    *Reunification Period*

In the Agency's September 2021 status review report, a social worker noted that P.S., Ka.S., and Ke.S. reported positive experiences with their caregivers, such as going to the beach and learning how to surf. The three siblings continued to have weekly visits—sometimes numerous visits per week—with their paternal grandparents. The children also visited with F.S. and E.S., and a social worker observed P.S. playing the ukulele for her siblings. She also witnessed F.S. taking Ka.S.'s hand and motioning for her to join him at Polinsky. The report further references one occasion when the paternal grandparents, parents, and extended family members had a supervised visit with the children and caregivers in a park.

The court appointed special advocate (CASA) for F.S. and E.S. observed three weekly sibling visits at Polinsky. She noted that P.S., Ka.S., and Ke.S. interacted with F.S. and E.S. "on a somewhat limited basis, such as ruffling E.S.'s hair or tickling him, and trying to redirect F.S. when he runs behind trees." The CASA further observed that "the three visiting siblings interacted more with each other and the paternal grandparents" than with F.S. and E.S. P.S. tended to interact with the boys the most and in a caregiver role, such as when she showed F.S. how to gently strum her ukulele. However, the CASA felt the consistent visits were "loving and appropriate, although somewhat limited at times due to the boys' diagnoses."

The Agency placed E.S. with a nonrelative caregiver in September 2021. At the scheduled six-month review hearing the same month, Mother requested that the court set a contested hearing. Because the parents continued to have little contact with the Agency, a social worker made an unannounced visit to the paternal grandparents' residence in October. She briefly spoke with both parents and provided them with their case plans, but

then the parents drove away. The paternal grandfather indicated that Mother began "throwing things" at him, including a sharp object that cut his arm, when he refused to disclose the address of E.S.'s placement. As a result, the paternal grandfather obtained a temporary restraining order against her, and Mother moved out of the house and into the paternal grandparents' van. The court continued services at the contested hearing and ordered that the children remain detained in their current placements.

P.S., Ka.S., and Ke.S. continued to engage in activities and improve academically while in foster care, and all three reported that they enjoyed residing with their caregivers. The caregivers expressed on multiple occasions their willingness to adopt or assume legal guardianship of the three children. F.S. remained at Polinsky. E.S. was reported to be doing well in his placement, although he continued to have some behavioral issues such as hair pulling and biting. All five siblings visited weekly at Polinsky, and P.S. and Ka.S. told their CASA that they loved seeing their brothers and would like to visit more often. Unfortunately, due to scheduling and transportation issues,[3] sibling visits with E.S. initially became more limited following his placement change.

Mother was incarcerated for over a week in November 2021 due to fraudulent activity involving her bank cards. The parents visited P.S., Ka.S, and Ke.S. once in November and Mother spoke with a social worker after the visit. The parents visited F.S. once as well during the reporting period but did not visit E.S. Otherwise, Mother and Father did not respond to Agency efforts to reach them or participate in services.

---

[3]     The reports by the Agency and F.S. and E.S.'s CASA repeatedly noted that the boys are challenging to transport because both require additional safety measures due to their diagnoses.

The children continued to have weekly sibling visits at Polinsky. During a January 2022 visit at a park, E.S. was happy to see his siblings, played for over an hour (particularly with Ka.S.), and said "bye" upon leaving, which was the first word his CASA had ever heard him speak. At the end of February 2022, the Agency placed F.S. with nonrelative extended family members. In an addendum report before the 12-month review hearing, the Agency reported that P.S., Ka.S., and Ke.S. all indicated they would like to remain placed with their caregivers.

At the contested 12-month review hearing in March 2022, the juvenile court concluded that returning the children to their parents' care would be detrimental to them, found there was not a substantial probability of return by the 18-month date, terminated reunification services, and set a permanency planning hearing pursuant to section 366.26.[4] F.S. was returned to Polinsky in April 2022, following inconclusive allegations of physical abuse by the caregivers.

## II.

### *Permanency Planning*

In its June 2022 report prior to the section 366.26 hearing, the Agency reported that P.S., Ka.S., and Ke.S. were doing well in school and had made friends. A social worker further noted that she received a call from Father in April 2022, informing her that he was in a recovery program in Hawaii. Father wanted to know how to regain placement of his children. P.S., Ka.S., and Ke.S. subsequently began having multiple phone visits per week with

---

[4]     Following the hearing, Father filed a notice of intent to file a writ petition seeking relief from the court's order setting a section 366.26 hearing. However, his attorney subsequently notified this court that there were no viable issues for writ review and the case was dismissed (D080181, April 22, 2022).

their father.  Meanwhile, Mother reported being incarcerated in May, and Father indicated she moved to Las Vegas in June.  Mother contacted P.S., Ka.S., and Ke.S. a few times during this period.

According to P.S., Ka.S., and Ke.S.'s caregiver and the girls' CASA, P.S. and Ka.S. were traumatized by their visits to Polinsky due to adverse experiences during their stay there, which made visiting F.S. challenging. Because of their feelings, the caregivers and paternal grandparents worked out a monthly visitation schedule at E.S.'s home.  F.S. required an escort and adequate transportation to attend these visits, which was difficult to arrange. Ka.S. also had a few virtual visits with her twin.

The CASA for the girls indicated in her June report that all five siblings had not visited together in quite some time, and F.S. and E.S.'s CASA echoed concern about the lack of visits.  However, all five siblings visited with Father and the paternal grandparents in July.  P.S. chatted with her cousin away from the group, Ka.S. and Ke.S. played ball with Father, and F.S. played on the playground with Father and then sat with his grandmother.  During a visit in August, P.S., Ka.S., and Ke.S. played on park structures and rolled a ball with E.S.  F.S. would not get out of the transport van, but a social worker said the siblings took turns laughing and playing games with him in the van and seemed to be enjoying themselves.  F.S.'s CASA described the day somewhat differently, stating that F.S.'s engagement with his siblings in the van "was limited since he was watching videos on a phone."  The parents did not attend.  In August, the siblings visited E.S. twice at a park near his home.  Visits with the parents were limited as both parents were repeatedly arrested, and Father relapsed after completing his substance abuse program in June.

In October 2022, counsel for P.S., Ka.S., and Ke.S. filed a section 388 petition requesting to modify the order allowing the parents liberal supervised visitation and suspend visits to prevent further inappropriate contact from the parents. Text messages from Mother had resulted in P.S.'s hospitalization due to suicidal ideation, and all three minors reported not wanting to communicate with their parents. During an October hearing, the juvenile court made a prima facie finding on the motion, set an evidentiary hearing on the same date as the contested section 366.26 hearing, and ordered no contact from the parents in the interim. The court found Father had not made a prima facie showing on a section 388 petition he filed requesting to have all five children placed with him and denied the motion.

Meanwhile, the Agency recommended adoption for P.S., Ka.S., and Ke.S., whose caregivers said they wanted to continue the siblings' connections with F.S. and E.S. and would make every effort to keep them bonded. P.S. and Ka.S. both said they would like to be adopted by their caregivers; Ke.S. avoided discussions about adoption and the social worker was not certain he understood the concept. The Agency recommended continued foster care for F.S. and E.S.

## III.

### *The Contested Section 366.26 Hearing*

At the contested section 366.26 hearing, counsel for P.S., Ka.S., and Ke.S. withdrew her section 388 motion. Mother testified and, when asked if she was concerned about P.S., Ka.S., and Ke.S.'s ongoing contact with their siblings, E.S. and F.S., if her parental rights were terminated, she responded, "I'm concerned that the family is split up." During closing arguments, Mother's and Father's attorneys argued that the court should apply the

9

parental-benefit exception or the sibling relationship exception and decline to terminate parental rights.

The court concluded that P.S., Ka.S., and Ke.S. were likely to be adopted and that the parental-benefit exception did not apply. In so doing, the court specifically noted: "Both [P.S. and Ka.S.] are on the autism spectrum. They have special needs. The daily routine as well as interaction with professionals is extraordinarily important for them. All of [*sic*] three of the children have shown progress while in the care of the current caretakers. Each, in their own way, has expressed a desire to be adopted citing issues such as security, role modeling and comfort."

With regard to the sibling-relationship exception, the court found that they were a five-sibling group, they were raised together in the same household for a period of time, they shared common experiences, and there were "varying levels of existing close knit, strong bonds with the siblings." However, the court determined "there would not be a substantial interference with the three siblings' relationship with their other two siblings." In balancing all the factors, the court further concluded that "both [F.S. and E.S.] have such significant needs that those needs cannot be met in a family setting. Here, two of the three children in the sibling subgroup are on the autistic spectrum. They're showing improvement in their care. [¶] So it would appear to the court that the benefit of legal permanence to adoption does outweigh the long-term emotional interests. As sad and tragic as that may appear, I believe this record justifies that finding." Accordingly, the court found adoption in P.S., Ka.S., and Ke.S.'s best interest, severed Mother's and Father's rights to these three children, and granted prospective adoptive parent status to their caregivers. Because F.S. and E.S. were not likely to be

10

adopted and no willing guardians had been identified, the court ordered continued foster care for them.

## DISCUSSION

Mother and Father challenge the juvenile court's finding that the beneficial sibling relationship exception did not apply.[5] "Adoption is the preferred plan and, absent an enumerated exception, the juvenile court is required to select adoption as the permanent plan." (*In re Fernando M.* (2006) 138 Cal.App.4th 529, 534.) The sibling relationship exception to adoption applies where the court concludes "[t]here would be substantial interference with a child's sibling relationship, taking into consideration the nature and extent of the relationship, including, but not limited to, [1] whether the child was raised with a sibling in the same home, [2] whether the child shared significant common experiences or has existing close and strong bonds with a sibling, and [3] whether ongoing contact is in the child's best interest, including the child's long-term emotional interest, as compared to the benefit of legal permanence through adoption." (§ 366.26, subd. (c)(1)(B)(v).) The parent bears the burden in the juvenile court of showing the exception applies. (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 949 (*L.Y.L.*).) This is considered "a heavy burden." (*In re Daniel H.* (2002) 99 Cal.App.4th 804, 813.)

Although any sibling relationship necessarily involves two or more siblings, a court considering the exception must focus its analysis on the child

---

[5] To the extent the parents raised additional issues in their notices of appeal that were not subsequently briefed on appeal, we deem them forfeited and do not address them. (*People v. Roscoe* (2008) 169 Cal.App.4th 829, 840 [issues not raised in the opening brief are forfeited]; see also *Berger v. Godden* (1985) 163 Cal.App.3d 1113, 1119–1120 [an appellate court is not required to "consider alleged error where the appellant merely complains of it without pertinent argument"].)

being considered for adoption, not the other siblings. (*In re Celine R.* (2003) 31 Cal.4th 45, 54.) " 'The author of the legislation adding the sibling relationship exception anticipated that "use of the new exception 'will likely be rare,' " meaning "that the child's relationship with his or her siblings would rarely be sufficiently strong to outweigh the benefits of adoption." ' " (*In re D.O.* (2016) 247 Cal.App.4th 166, 174 (*D.O.*).)

Application of the sibling relationship exception requires a two-step analysis. First, the court must determine whether terminating parental rights would substantially interfere with the sibling relationship. (*D.O.*, *supra*, 247 Cal.App.4th at p. 173.) Second, *if* the court determines termination would substantially interfere with the relationship, it must then " 'weigh the child's best interest in continuing that sibling relationship against the benefit the child would receive by the permanency of adoption.' " (*Id.* at pp. 173–174.)

"To the extent appellants challenge the juvenile court's ultimate determination, we apply the substantial evidence standard to the juvenile court's underlying factual determinations, and the abuse of discretion standard to the court's weighing of competing interests." (*D.O.*, *supra*, 247 Cal.App.4th at p. 174.)

Both parents in this case expressed concern that terminating parental rights would substantially interfere with the sibling relationship. Father argued that legal guardianship was the only way to guarantee the siblings would have ongoing contact since there was no post-adoption contact agreement in place. Mother expressed similar concerns and submitted that the decrease in visits from weekly to monthly showed that the prospective adoptive parents were not committed to maintaining the sibling relationship.

12

As an initial matter, in evaluating whether adoption would substantially interfere with a sibling relationship, the juvenile court may consider evidence that the children are likely to have ongoing contact with their siblings even if there is no specific visitation contract in place prior to the court terminating parental rights. As the court explained in *D.O.*, although section 366.26 expressly enumerates three factors to consider when determining whether to apply the sibling relationship exception, "it also provides that the court's analysis should 'tak[e] into consideration the nature and extent of the [sibling] relationship, *including, but not limited to,*' those expressly enumerated factors." (*D.O.*, *supra*, 247 Cal.App.4th at pp. 174–175.) In other words, "the plain language of section 366.26, subd. (c)(1)(B)(v) authorized the juvenile court to consider factors other than those expressly articulated in the statute—such as a proven history of, and expressed commitment to, sibling visits." (*Id.* at p. 175.) Although "the court *may* include in the final adoption order provisions for the adoptive parent or parents to facilitate postadoptive sibling contact" (italics added), it may do so only "[w]ith the consent of the adoptive parent or parents" and "[i]n no event shall the continuing validity of the adoption be contingent upon the postadoptive contact." (§ 366.29, subd. (a).) Thus, the juvenile court is not obliged to include such a provision, and Father offers no authority requiring the juvenile court to order guardianship in the absence of an express post-adoption visitation contract. We therefore conclude the juvenile court properly considered evidence that the siblings would have ongoing contact even if the court terminated parental rights and was not prohibited from ordering adoption under these circumstances.

Mother's argument implies that, even though it was appropriate for the court to consider the prospective adoptive parents' assurances that they

13

would continue sibling visits, substantial evidence did not support the court's conclusion that "there would not be a substantial interference with the three siblings' relationship with their other two siblings." Mother points to the decrease in frequency of visits as evidence that there is no reason to have confidence that the caregivers will keep up with visitation after the adoption is final. However, speculation that visits will decrease or cease after adoption, despite a caregiver's expressed intention to maintain contact, is not substantial evidence that adoption will interfere with the sibling relationship. (See *In re Daisy D.* (2006) 144 Cal.App.4th 287, 293.) We also cannot consider this issue in a vacuum. (See *In re Valerie A.* (2007) 152 Cal.App.4th 987, 1014 (*Valerie A.*) [concluding that a court cannot "ignore the practical realities of the extended family's circumstances in considering whether termination of parental rights would substantially interfere with the sibling relationships"].) The caregivers in this case changed the visitation schedule not because of a lack of commitment to maintaining the sibling bond, but to protect P.S. and Ka.S. from the trauma of visiting Polinsky. They then demonstrated their continued dedication to visitation by proactively coordinating directly with E.S.'s caregiver and the paternal grandparents to move visits to E.S.'s home. There is no evidence F.S. was intentionally excluded from these visits; his need for an escort and adequate transportation (issues outside of the prospective adoptive parents' control) simply made it challenging for him to attend. The caregivers also took P.S., Ka.S., and Ke.S. to several visits with the siblings and extended family members in parks and facilitated virtual visits between F.S. and his twin. Thus, although there are practical hurdles to overcome in maintaining contact with F.S. and E.S., the caregivers have shown willingness to adapt and craft alternate solutions and have fostered contact between the siblings

14

for over a year and a half. On this record, we conclude substantial evidence supported the juvenile court's conclusion.

The parents also present no evidence that ordering guardianship would lessen the difficulties of coordinating visits with F.S. Even court-ordered visitation would not alter the reality that he is at Polinsky, visiting him there causes the girls trauma, and transporting him elsewhere involves significant logistical difficulties. (See *Valerie A., supra,* 152 Cal.App.4th at p. 1014 [declining to apply sibling relationship exception where "the selection of a lesser-preferred permanency plan would not further the children's interests in maintaining their relationships with [their sibling], nor would it provide them with the security and sense of belonging conferred by adoption"].) The parents do not suggest that the court would order the girls to visit Polinsky despite their trauma, nor do they point to any steps the court could take to alleviate the transportation challenges. Furthermore, even if evidence supported the conclusion that a guardianship would somehow result in more sibling visitation, it would not alter our decision. "When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court." (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318–319 (*Stephanie M.*).) The juvenile court acknowledged that the siblings had been raised together, shared common experiences, and were strongly bonded and these points are largely undisputed. But substantial evidence supported the juvenile court's determination that terminating parental rights would not substantially interfere with the sibling relationship and we cannot reweigh the evidence on appeal.

Even assuming the parents had met this threshold element, they also were required to demonstrate that the juvenile court abused its discretion in

concluding that the benefits of adoption outweighed P.S., Ka.S., and Ke.S.'s interest in continuing the sibling relationship with their brothers. (*D.O.*, *supra*, 247 Cal.App.4th at pp. 173–174.) The evidence here shows that P.S. and Ka.S. have ASD, P.S. also has a learning disability, and all three children have individualized education plans to help them deal with their struggles at school. The female caregiver is a special education teacher and knows that children with ASD, like P.S. and Ka.S., need consistency and stability. For this reason, she takes time to prepare the girls in advance for activities, events, and meetings so they feel comfortable and do well. As a result, all three siblings enjoy school and have improved grades. They also have been able to make friends, in some cases for the first time, and engage in new activities they enjoy such as music and sports. The caregivers also have ensured that the three children attended all their medical and dental appointments, and both caregivers immediately responded with appropriate medical care and emotional support during P.S.'s emotional crisis. We conclude this constitutes substantial evidence supporting the juvenile court's conclusion that the caregivers are "proactive with regard to assisting the children" and P.S., Ka.S., and Ke.S. are "showing improvement in their care."

The question then is whether the juvenile court abused its discretion in concluding that these benefits of adoption outweighed any loss in ongoing contact with F.S. and E.S. A dependency court abuses its discretion when its decision exceeds the bounds of reason. (St*ephanie M., supra,* 7 Cal.4th at pp. 318–319.) In recent visits, the three foster siblings have only been able to engage with F.S. and E.S. on a limited basis—such as rolling a ball with E.S. or keeping F.S. company while he watched his phone. And, due to these boys' extensive needs, visits remain challenging because they require a support person to make it possible to attend and participate in visits. The juvenile

court weighed this evidence against the significant benefits P.S., Ka.S., and Ke.S. have gained from this particular foster placement. While it undoubtedly was a difficult decision, under these circumstances, it was reasonable for the court to conclude that this was not the rare situation where the three foster children's relationship with their brothers was sufficiently strong to outweigh the considerable benefits of adoption.

*In re Naomi P.* (2005) 132 Cal.App.4th 808 (*Naomi P.*), upon which Father relies to support his claim of error, does not persuade us otherwise. In *Naomi P.*, the juvenile court heard testimony from Naomi's three older siblings, her maternal grandmother, her mother, and her resource mother regarding the bond between the siblings. (*Naomi P., supra,* 132 Cal.App.4th at pp. 811, 813, 824.) "In finding the exception applicable, the [juvenile] court specifically noted that it relied on the demeanor of the witnesses in making its decision." (*Id.* at p. 824.) It particularly noted the " 'happy, joyful expression[s]' " on the older siblings faces and expressed some concern about the resource mother's intentions. (*Ibid.*) On appeal, the reviewing court concluded that because it is not a reviewing court's "role to interfere with the trial court's assessment of the witnesses' demeanor and credibility," and because the "[t]he juvenile court had before it substantial evidence to support its conclusion that all requirements had been met to justify application of the sibling relationship exception," it was appropriate to affirm the guardianship order. (*Id.* at pp. 824–825.) While these facts may have been adequate to affirm an existing guardianship order, they are not sufficiently comparable to support reversal of an order finding adoption appropriate. To the contrary, in the instant case, no one but Mother testified as to the sibling bond, and the record contained evidence that at least P.S. and Ka.S. understood the potential consequences of adoption and nonetheless wanted to be adopted.

17

(See *L.Y.L., supra,* 101 Cal.App.4th at p. 953 [factoring into the analysis the fact that L. Y. wanted to be adopted even if it ended her relationship with her sibling].) F.S. and E.S., unfortunately, were not able to voice their opinions, and Ke.S. repeatedly expressed that he enjoyed living with his caregivers. All three foster children thrived in their placement, and neither the court nor the Agency expressed any reservations about the caregivers. Thus, the record contained substantial evidence supporting the juvenile court's conclusion that the requirements of the sibling relationship exception had *not* been met and, like the court in *Naomi P.*, we will not interfere with the juvenile court's assessment of witness credibility or its weighing of the evidence. The court did not abuse its discretion.

## DISPOSITION

The November 8, 2022 orders are affirmed.

HUFFMAN, Acting P. J.

WE CONCUR:

IRION, J.

DATO, J.

18